Aaron C. Garrett, #12519
Executive Director
Nonprofit Legal Services of Utah
177 East 900 South, Suite 202
Salt Lake City, UT 84111
(385) 419-4111
aaron@nonprofitlegalservices.com

Ann Alexander (Pro Hac Vice pending)
Senior Attorney
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94101
(415) 875-6190
aalexander@nrdc.org

Nathaniel Shoaff (Pro Hac Vice pending)
Senior Attorney
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEATHY ENVIRONMENT, SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, NATIONAL PARKS CONSERVATION ASSOCIATION, GRAND CANYON TRUST, WILDEARTH GUARDIANS, <br><br> Plaintiffs, | Case No. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

vs.

U.S. BUREAU OF LAND
MANAGEMENT, an agency within the
U.S. Department of the Interior; U.S.
DEPARTMENT OF THE INTERIOR, a
federal agency; JOSEPH R. BALASH,
in his official capacity as Assistant
Secretary for Land and Minerals within
the Department of the Interior; DAVID
BERNHARDT, in his official capacity
as Secretary of the Department of the
Interior,

                Defendants.

## INTRODUCTION

1.     Plaintiffs, Utah Physicians for a Healthy Environment, Sierra Club,

Natural Resources Defense Council, National Parks Conservation Association,

Grand Canyon Trust, and WildEarth Guardians hereby challenge the actions of the

U.S. Bureau of Land Management, U.S. Department of the Interior, Joseph R.

Balash, in his official capacity as Assistant Secretary for Land and Minerals within

the Department of the Interior, and David Bernhardt, in his official capacity as

Secretary of the Department of the Interior (collectively, Federal Defendants) in

approving the sale of a federal coal lease pursuant to the Alton Coal Tract Lease by

Application (Lease), on public lands located in Utah.  Federal Defendants'

approval of the Lease sale violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h.

2.     Federal Defendants approved the Lease through an August 29, 2018 Record of Decision (ROD) that authorized the Lease of federal lands adjacent to the existing Coal Hollow coal mine located near the town of Panguitch, Utah, roughly ten miles from Bryce Canyon National Park (Park). The NEPA process that culminated in the ROD included a Draft Environmental Impact Statement (EIS) published on November 4, 2011, a Supplemental Draft EIS published in June 2015, and a Final EIS published on July 13, 2018.

3.     Federal Defendants' decision authorizes the competitive lease sale of approximately 2,114 acres of both federal lands and split estate (privately owned surface lands with federal minerals below ground) containing approximately 40.9 million tons of in-place coal and an estimated 30.8 million tons of recoverable coal. Federal Defendants expect that both surface strip mining and underground mining will be used to recover coal as part of the Lease.

4.     Mining operations are expected to continue pursuant to the Lease for 16 years, with an additional 10 years of reclamation activities following the completion of active mining operations.

5.     The Federal Defendants' Record of Decision and Final EIS violated NEPA for two reasons. First, Federal Defendants failed to adequately analyze and

3

disclose the indirect and cumulative environmental impacts of mercury and other pollutants emitted from burning coal that will be mined pursuant to the Lease in coal-fired power plants. Second, Federal Defendants failed to provide any assessment of the direct, indirect, and cumulative environmental impacts from the greenhouse gas (GHG) emissions that the U.S. Bureau of Land Management quantifies and acknowledges will occur when the coal is mined and burned.

## JURISDICTION AND VENUE

6. This Court has federal-question jurisdiction over this action, 28 U.S.C. § 1331, which arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

7. The requested declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action, the Alton coal mine, is located in Utah. Additionally, a substantial part of the events or omissions giving rise to this action occurred in Utah, and impacts from the mine's production, transportation, and combustion will be felt, in part, in Utah.

9. Venue is also proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because officers of the United States are defendants, a substantial part of the events or omissions giving rise to the claim occurred in Utah, and the subject property is

4

located in Utah; or, alternatively, because Plaintiff Utah Physicians for a Healthy Environment maintain its principle place of business in Utah.

10.     Plaintiffs have standing under Article III of the U.S. Constitution because the challenged actions cause them recreational and aesthetic harm, which will be remedied by a favorable ruling from this Court.

11.     The challenged actions are final and subject to judicial review under 5 U.S.C. §§ 702, 704, 706.

12.     Plaintiffs have exhausted any and all available and required administrative remedies.

## PARTIES

13.     Plaintiff Utah Physicians for a Healthy Environment (UPHE) is one of the largest civic organizations of health care professionals in Utah. UPHE is a 501(c)(3) non-profit organization with over 3,000 members and supporters, including more than 350 physicians and working professionals. UPHE is concerned about the health risks present in our environment, based on the overwhelming, convincing evidence in medical literature demonstrating a wide array of chronic diseases that are more common among people who are exposed to more air pollution, particulates especially. UPHE is dedicated to protecting the health and wellbeing of the citizens of Utah by promoting science-based education

and interventions that result in progressive, measurable improvements to the

environment.

14.    Plaintiff Sierra Club is a national non-profit organization with 64

chapters and over 700,000 members nationwide, including more than 5,400 in

Utah, dedicated to exploring, enjoying, and protecting the wild places of the earth;

to practicing and promoting the responsible use of the earth's ecosystems and

resources; to educating and enlisting humanity to protect and restore the quality of

the natural and human environment; and to using all lawful means to carry out

these objectives. Sierra Club's concerns encompass the exploration, enjoyment,

and protection of the lands, water, and air in Utah.

15.    Plaintiff Natural Resources Defense Council (NRDC) is a non-profit

environmental membership organization that uses law, science, and the support of

more than two million members and activists throughout the United States to

protect wildlife and wild places and to ensure a safe and healthy environment for

all living things.  Over 2,600 of NRDC's members reside in Utah.  NRDC has a

long-established history of working to protect public lands and clean air and

addressing climate change by promoting clean energy and reducing America's

reliance on fossil fuels. NRDC members use and enjoy public lands in Utah, and

such use and enjoyment will be adversely affected by the proposed expansion of

the Alton coal mine.  NRDC brings this action on its own behalf and on behalf of

its members.

16.    Plaintiff National Parks Conservation Association (NPCA) is a non-

profit advocacy organization whose mission is to protect and enhance America's

National Park System for present and future generations.  Founded in 1919, NPCA

is the leading voice for the national parks.  NPCA is a national non-profit with 27

regional and field offices across the country, including an office in Salt Lake City,

Utah.  In support of its mission, among other things, NPCA engages in legislative,

administrative, and judicial processes to advance its deep organizational interest in

protecting the air, climate, and other national park resources, including at Bryce

Canyon National Park.  NPCA represents over 1.3 million members and

supporters, including 11,457 in Utah, who care about protecting America's shared

natural and cultural heritage from threats such as those associated with the

proposed coal mine expansion.

17.    Plaintiff Grand Canyon Trust is a non-profit advocacy organization

with over 4,000 members. The Trust is headquartered in Flagstaff, Arizona and has

offices in Utah and Colorado. The Trust's mission is to safeguard the wonders of

the Grand Canyon and the Colorado Plateau, while supporting the rights of its

Native peoples. The Alton lease expansion sits on the Colorado Plateau,

surrounded by public lands that the Trust has long sought to protect and preserve,

7

such as Bryce Canyon National Park, Grand Staircase-Escalante National Monument, and Zion National Park. For decades, the Trust has also fought to curb haze, toxic air pollution, and GHGs emitted by coal-fired power plants around the Plateau, and the Trust has long been an advocate against irresponsible coal mining on public lands that fuels that pollution. Expanding the Alton coal mine clashes with the Trust's vision for the Colorado Plateau—one in which, among other aspirations, wildness, a diversity of native plants and animals, clean air, flowing rivers abound, and a livable climate endures.

18.    Plaintiff WildEarth Guardians is a non-profit conservation organization with major offices in Denver, Colorado; Santa Fe, New Mexico; Missoula, Montana; and Portland, Oregon. Guardians' mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West. Guardians has over 200,000 members and supporters, many of whom live, work, and/or recreate in western states, including around the Alton mine.

19.    In bringing this lawsuit, Plaintiffs stand in the shoes of members, staff, and other supporters who live, work, and recreate in places threatened by the Mine. Members and staff of the Plaintiffs' organizations regularly use and enjoy public lands near the Lease area for a variety of purposes, including hiking, camping, star gazing, photography, recreation, professional activities, and aesthetic appreciation of the area's natural and wild values; and intend to continue doing so.

8

For example, members of the Plaintiff organizations operate a tour company in the Park; are avid birders who would like the opportunity to continue to see Greater Sage-Grouse; frequently hike and drive where there are panoramic views; and enjoy photographing wilderness vistas.

20.   Plaintiffs' members and staff also frequent and recreate in the area near the Intermountain Power Plant, engaging in camping, hiking, wilderness photography, scenic driving, and professional activities; and intend to continue doing so.

21.   For these reasons, the Plaintiffs' members and staff desire to protect the wildlife, scenery, air quality, and other natural values of Utah from the direct, indirect, and cumulative impacts of the Mine so that they can continue to enjoy these activities without hindrance. They desire to continue to use and enjoy the affected areas without, for example, breathing the polluted air that would result from the Mine and associated coal combustion; driving on the roads near the Park that would be impacted by increased coal truck traffic; or looking at and photographing wilderness vistas through diminished visibility.

22.   The Federal Defendants' decision to authorize the lease of public lands for the purposes of expanding a coal mine onto publicly-owned lands thus irreparably harms Plaintiffs' health, recreational, economic, professional, and aesthetic interests and the interests of their members because it will destroy

9

wildlife habitat and vegetation, increase particulate matter and other air emissions, increase truck traffic, and cause other impacts that will degrade Plaintiffs' members' enjoyment of the affected areas. The declaratory and injunctive relief that Plaintiffs seek in this lawsuit will redress their injuries by setting aside Defendants' approval of the Lease and requiring Defendants to comply with NEPA and the APA.

23.     Defendant U.S. Department of the Interior is a federal department responsible for implementing and complying with federal laws governing approval of mining plan modifications, including NEPA.

24.     Federal Defendant U.S. Bureau of Land Management (BLM) is a federal agency within the United States Department of the Interior that is responsible for the management of more than 245 million acres of public lands in the United States and nearly 700 million acres of federal subsurface mineral estate.

25.     Defendant Joseph R. Balash is the Assistant Secretary for Land and Minerals Management at BLM. Mr. Balash is responsible for complying with federal laws governing approval, conditional approval, or disapproval of applications for mining plan modifications. On August 29, 2018 Mr. Balash signed the Record of Decision finalizing BLM's decision to offer the Alton federal coal Lease for sale.

10

26.     Defendant David Bernhardt is the Secretary of the U.S. Department of the Interior. Mr. Bernhardt is responsible for implementing and complying with federal laws governing mining plan modifications, including NEPA.

## FACTS

### The Alton Coal Lease by Application

27.     The Lease would allow the existing Coal Hollow Mine, which is currently operated on private lands by Alton Coal Development (Alton), to expand onto federal lands managed by BLM.  The existing mine, and the 2,114 acre federal tract onto which Alton proposes to expand it, are located approximately ten miles from the Park.  The proposed expanded mine on BLM land (Mine) would use primarily surface mining (a/k/a strip mining) methods, employing scrapers, bulldozers, and front-end loaders to scrape away the "overburden" of soil, shrubs, and trees.

28.     Pursuant to the requirements of NEPA, BLM conducted an environmental review of the proposed Lease.  The review included a Draft EIS (DEIS), a Supplemental Draft EIS (SDEIS), and a Final EIS (FEIS).

29.     Also pursuant to the requirements of NEPA, BLM solicited public comment on the DEIS and SDEIS.  Plaintiffs, together with other commenters, submitted comments identifying numerous concerns with the Lease and its potential impact on the Lease tract and surrounding public lands, including Bryce

Canyon National Park. The concerns raised included BLM's failure to consider the indirect impacts of coal combustion, the claim raised in this Complaint; as well as failure to adequately consider how the proposed expanded mine would jeopardize the iconic landscapes of Grand Staircase-Escalante National Monument and the uncommonly dark night skies in the Park; degrade the air, water, and natural landscapes of Utah; put Utah's recreation tourism industry at risk; threaten tribal cultural resources; and potentially eliminate the southern-most population of Greater Sage-Grouse in North America.

30.     After the FEIS was issued in July 2018, BLM issued its ROD in August 2018, selecting the 2,114-acre alternative out of others it had considered. The FEIS and ROD identified the following environmental impacts of the Project, among others, notwithstanding various mitigation measures:

a) *Air quality.* The Mine will result in an increase of conventional air pollutants including particulate matter (PM), nitrogen oxides ($NO_x$), volatile organic compounds (VOCs), carbon monoxide (CO), and sulfur dioxide ($SO_2$); and hazardous air pollutants including benzene, toluene, xylenes, formaldehyde, acetaldehyde, and acrolein, in and near the Park as a result of the strip mining activities and truck traffic.  FEIS-ES § ES 1.6.2 (p. ES-14); FEIS § 4.3.6 (p. 4-81).

b) *Visibility.* Air pollutants from the Mine, including particulate matter, may diminish visibility in and around the Park.  FEIS at § 4.3.6 (p. 4-81).

c) *Greater Sage-Grouse.* The industrial activity at the Mine would cause significant disturbance to the lek (breeding ground) used by the southern-most Greater Sage-Grouse population.  FEIS § 4.18.2.4.4 (p. 4-304).

d) *Traffic.* The Mine will result in a 33 percent increase in heavy truck traffic on nearby roads, including Highway 89.  FEIS § 4.12.3.4 (p. 4-146).  The trucks will generate an increase in particulate matter pollution.

e) *Night skies.* The Mine will contribute to nighttime light pollution in and around the Park, with lighting levels permitted at the mine of up to 3.15 million lumens.  FEIS-ES § ES.1.6.1 (p. ES-14).

f) *Noise.* The Mine will be associated with increased noise levels, up to 64 decibels from mine-related haul and commuter traffic.  FEIS at § 4.2.2.2.2 (p. 4-16).

**Failure to Consider Non-GHG Pollution From Coal Combustion**

31.      BLM acknowledged in its analysis that "[c]oal combustion is an indirect impact that is a reasonable progression of the mining activity."  FEIS at 4-

13

54. However, on the rationale that BLM could not forecast with certainty at which particular power plant the coal from the Mine would be combusted, BLM made the assumption for analytical purposes that all of it would be combusted at the Intermountain Power Plant (IPP) in Delta, Utah, which currently combusts coal from Alton's Coal Hollow Mine.  *Id.* at 4-54 - 55.

32.     BLM further acknowledged in the FEIS that when burned, coal releases numerous pollutants, including $SO_2$, $NO_x$, PM, mercury, and lead.  *Id.*

33.     These pollutants endanger human health.  $SO_2$, $NO_x$, and PM have been linked to respiratory and cardiac illness; and mercury and lead are powerful neurotoxins.  BLM acknowledged in the FEIS that "[s]tudies have linked PM exposure to health problems such as irritation of the airways, coughing, difficulty breathing, reduced lung function, aggravated asthma, chronic bronchitis, irregular heartbeat, nonfatal heart attacks, and some cancers."  FEIS at 4-147.

34.     Combusting coal increases the amount of mercury deposited in the environment.  Mercury deposition poses risks to both human health and the survival of endangered and other native fish in rivers and other waterbodies. Burning coal from the Mine will result in emissions from coal-fired power plants that could further exacerbate harms to already-impacted fish in the Colorado River, Green River, and White River, including the endangered Colorado pikeminnow, razorback sucker, and humpback chub. Some of the highest levels of mercury

14

concentration in fish tissue within the entire region of the Upper Colorado River Basin occur in Colorado pikeminnow in the Middle Green River, located in close proximity to IPP.

35.     The Colorado pikeminnow is a critically-endangered fish and top natural predator in the Colorado River that has been federally protected since 1967. The pikeminnow is imperiled due to widespread destruction and modification of the Colorado River basin, including its tributaries. It currently survives as a result of stocking programs in some areas of the Upper and Lower Colorado River Basins, and in a limited stretch of the San Juan River. The Green River, tributary to the Colorado River, is critical to the long-term survival and recovery of the Colorado pikeminnow, constituting the largest target population for the potential downlisting and delisting of the species.

36.     BLM and the Department of the Interior's Office of Surface Mining Reclamation and Enforcement (OSMRE) were and are considering multiple coal mine development approvals roughly contemporaneously with, and in the geographic vicinity of, the Mine.  These include, without limitation, the 42 million ton Flat Canyon coal lease and the 60 million ton Greens Hollow coal lease in central Utah, the 167 million ton Hay Creek II coal lease in Wyoming, the 198 million ton Spring Creek II coal lease and the Rosebud coal mine expansion in Montana, and the Oxbow and Colowyo mine expansions in Colorado.

37.    In the FEIS, BLM quantified the volume of non-GHG pollutants that would be emitted as a result of combustion of coal from the Mine. It derived the pollutant volumes from such combustion – assumed for analytical purposes to occur at IPP – from the estimate of 2 million tons of coal anticipated to be produced annually from the Mine, plus emission factors and other data.

a)    BLM estimated that combustion of the 2 million tons of coal annually would result in emission of 3,687.1 tons per year (tpy) CO, 11,834.5 typ $NO_x$, 1,041.9 tpy PM measuring 10 micrometers or less $PM_{10}$, 3,535.6 tpy $SO_2$, 20.3 tpy VOCs, and 29.5 tpy hazardous air pollutants (HAPS). FEIS at 4-54 – 55.

b)    BLM further determined that combustion of the 2 million tons of coal would result in emissions of 166.0 pounds per year of mercury. FEIS at 4-78. On a per weight basis, mercury is considered the most toxic substance on earth after plutonium, and the most toxic natural heavy metal.

38.    Notwithstanding these numeric quantifications of anticipated pollutant emissions, the acknowledged harms associated with these pollutants, and the assumption for analytical purposes that the pollutants would be emitted at IPP, BLM failed to perform further analysis of the impacts of the quantified pollutants.

a) With respect to CO, $NO_x$, $PM_{10}$, $PM_{2.5}$, $SO_2$, VOCs, and HAPS, BLM
   declined to analyze the indirect human health impacts of those
   pollutants, stating that, notwithstanding its analytical assumption that
   the 2 million tons of coal would be burned at IPP, "the end users of
   the coal mined from the tract are unknown at this time, and the rate at
   which the coal would be burned is also unknown," and hence
   "[i]mpacts from coal going to other locations would be too speculative
   and therefore would not be meaningful to the decision-maker."  FEIS
   at 4-54.  BLM further declined to analyze the cumulative impact of
   these pollutants.

b) With respect to indirect impacts of mercury deposition, BLM
   acknowledged generally that "[w]hen mercury released by the
   combustion of coal is deposited on land and water, it accumulates in
   the food chain and can be toxic to fish, wildlife, and humans" and that
   "[m]ercury released into the atmosphere by the combustion of coal
   mined from the tract could be deposited and accumulate in
   hydrological systems, potentially affecting fish, wildlife, and
   humans."  FEIS at 4-78. However, BLM declined to further analyze
   the impact of the mercury deposition on the Colorado pikeminnow or
   otherwise, on the ground that the actual emissions would vary

17

somewhat depending on permit requirements and emission control
technology at combusting facilities. *Id.* at 4-79.

c) BLM performed no analysis of the cumulative impacts of mercury
deposition associated with the other contemporaneous BLM coal
mining projects or otherwise.

**Failure to Consider GHG Pollution From Coal Combustion**

39.     BLM acknowledged that GHGs such as $CO_2$ emitted as a result of
combustion of coal from the Mine will contribute to global climate change.  BLM
stated in the FEIS as follows:

a) "[T]he amount of $CO_2$ in the atmosphere has been steadily increasing
from approximately 316 ppm in 1959 to 397 ppm (preliminary data)
in 2013 (NOAA 2013). This increase in atmospheric $CO_2$ is attributed
almost entirely to … anthropogenic (e.g., human) activities." FEIS at
4-323.

b) "Fossil fuel burning, specifically from power production and
transportation, is the primary contributor to increasing concentrations
of $CO_2$ (IPCC 2007a)." *Id.*

c) "According to the IPCC fourth assessment report, '[w]arming of the
climate system is unequivocal, as is now evident from observations of
increases in global average air and ocean temperatures, widespread

18

melting of snow and ice, and rising global average sea level' (IPCC 2007b)." *Id.*

d) "The IPCC report states that, in addition to increases in global surface temperatures, the impacts of climate change on the global environment may include more frequent heat waves, droughts, and fires; rising sea levels and coastal flooding; melting glaciers, ice caps, and polar ice sheets; more severe hurricane activity and increases in frequency and intensity of severe precipitation; spread of infectious diseases to new regions; loss of wildlife habitats; and heart and respiratory ailments from higher concentrations of ground-level $O_3$." *Id.* at 4-324.

40.     The above-described impacts of global climate change impose economic costs on society.  Accordingly, one scientifically accepted approach to evaluating the impact of GHG emissions is to estimate those costs.  The former federal Interagency Working Group on the Social Cost of Carbon, comprised of experts from more than a dozen federal agencies and offices, developed estimates of the economic damage caused by $CO_2$ emitted into the atmosphere using a tool known as the Social Cost of Carbon.  The EPA and other federal agencies have used the Social Cost of Carbon protocol to estimate the effects of rulemakings and project-level decisions on climate.  This tool estimates the global financial cost of

19

each additional ton of $CO_2$ pollution emitted into the atmosphere, taking into account factors such as diminished agricultural productivity, droughts, wildfires, increased intensity and duration of storms, ocean acidification, and sea-level rise.

41.     BLM estimated that combustion of the 2 million tons of coal from the Mine would result in emissions of 4.8 million tpy of the GHG $CO_2$.  FEIS at 4-80.

42.     The economic damage from the GHG emissions caused by mining, shipping, and burning the coal from the Mine, as calculated by the Social Cost of Carbon, ranges from $24.6 million to as much as $7 billion annually.

43.     Notwithstanding its quantification of $CO_2$ emission volume associated with the Mine, BLM declined to employ the Social Cost of Carbon or any other quantitative tool to assess the direct or indirect impact of those emissions.

44.     Despite its refusal to quantify monetarily the harm caused by the project's direct and indirect GHG emissions, BLM did quantify purported economic benefits of its preferred alternative for expanding the Mine.  These included dollar estimates of the value of miners' income ($107 million), economic contribution of coal for export ($113.4 million), sales value of the coal ($1.7 billion), federal royalties ($26.4 million), and additional taxes and fees ($4.5-$6.8 million).  FEIS 4-133 – 39.

45.     BLM further failed to assess cumulative GHG impacts of the Mine as considered together with other coal mining projects considered and approved by BLM.  BLM included only generalized and qualitative statements to the effect that the GHGs attributed to coal from the Mine "would contribute incrementally" to the climate change impacts it had identified; but asserted that further analysis would not be done because "there is a limited scientific capability to estimate the specific impacts" of an increment of climate change pollution.  FEIS at 4-325.

46.     In a February 14, 2019 press release, which quotes both Defendant Balash and Defendant Bernhardt, the Department of the Interior announced that it sold the 30.8 million tons of recoverable coal in the Lease tract for $12,320,000 – approximately 40 cents per ton – and noted that the Lease could "directly create 100 new jobs at the mine and indirectly increase employment by 240 to 480 jobs."

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (NEPA Violation: Failure to Take a Hard Look at Indirect and Cumulative Effects of Non-GHG Emissions)

47.     Plaintiffs incorporate by reference all preceding paragraphs.

48.     NEPA requires federal agencies' environmental analyses to consider "*any* adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii) (emphasis added).

21

49.     NEPA requires federal agencies, including the BLM and the

Department of the Interior, to take a "hard look" at the direct, indirect, and

cumulative impacts of proposed major federal actions. 42 U.S.C. § 4332(C)(i)-(ii);

40 C.F.R. §§ 1502.16, 1508.25(c). Federal regulations define impacts or effects

under NEPA to include ecological (such as the effects on natural resources and on

the components, structures, and functioning of affected ecosystems), aesthetic,

historic, cultural, economic, social, or health. 40 C.F.R. § 1508.8.

50.     Direct impacts are "caused by the action and occur at the same place

and time." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later

in time or farther removed in distance but are still reasonably foreseeable." *Id.*

§ 1508.8(b).

51.     Cumulative impacts are "the impact[s] on the environment which

result[] from the incremental impact of the action when added to other past,

present, and reasonably foreseeable future actions, regardless of what agency

(Federal or non-Federal) or person undertakes such actions." *Id.* § 1508.7.

52.     Federal Defendants failed to take the required "hard look" at the

indirect environmental impacts of non-GHG air pollutants it estimated would be

emitted from burning coal from the Mine, including but not limited to human

health impacts, economic impacts, and impacts on endangered species such as the

Colorado pikeminnow and others.

22

53.   Federal Defendants further failed to take the required "hard look" at the cumulative impacts of non-GHG air pollutants it estimated would be emitted from burning coal from the Mine in conjunction with other geographically proximate and contemporaneous coal mine projects considered or approved by BLM or OSMRE.

54.   The Federal Defendants' failure to take the required "hard look" at the indirect and cumulative impacts of emissions from coal combustion violates NEPA, 42 U.S.C. § 4332.  BLM's approval of the Lease is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for purposes of the APA, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION

### (NEPA Violation:  Failure to Take Hard Look at Indirect and Cumulative Effects of GHG Emissions)

55.   Plaintiffs incorporate by reference all preceding paragraphs.

56.   NEPA requires federal agencies to "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(2)(B).

57.   The Federal Defendants quantified the purported economic benefits of the Mine using dollar values, but declined to use the Social Cost of Carbon or

any other method to quantify the climate change impacts of $CO_2$ resulting from combustion of coal from the Mine, thus effectively estimating these impacts at zero. This failure by Federal Defendants to take the required "hard look" at the indirect impacts of the $CO_2$ emissions that result from the Lease violates NEPA, 42 U.S.C. § 4332, and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for purposes of the APA, 5 U.S.C. § 706.

58.     Defendants further failed to assess the cumulative climate change impacts of $CO_2$ resulting from combustion of coal from the Mine when added to other "past, present, and reasonably foreseeable future action" as required by NEPA and 40 C.F.R. § 1508.7.

59.     The Federal Defendants' failure to take the required "hard look" at the indirect and cumulative climate impacts of approving the Lease violates NEPA, 42 U.S.C. § 4332. BLM's approval of the Lease is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for purposes of the APA, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against Federal Defendants and provide the following relief:

A.      Declare that Federal Defendants' actions violate NEPA, the regulations and policies promulgated thereunder, and the APA;

B.      Vacate and set aside Federal Defendants' Final EIS and Record of Decision;

C.      Enjoin Federal Defendants from re-issuing or approving the Lease and Record of Decision until Federal Defendants have demonstrated compliance with NEPA and the APA;

D.      Order Federal Defendants to inform the holder of the Lease that the approval of the Lease has been vacated and that mining operations in the Lease area must cease until Federal Defendants comply with their obligations under NEPA and the APA;

E.      Award Plaintiffs their fees, costs, and other expenses as provided by applicable law;

F.      Issue such additional relief as this Court may deem just, proper, and equitable.

Respectfully submitted this 16th day of April, 2019.


                              _____/s/_____
                              Aaron C. Garrett
                              Executive Director
                              Nonprofit Legal Services of Utah
                              177 East 900 South, Suite 202
                              Salt Lake City, UT 84111

(385) 419-4111
aaron@nonprofitlegalservices.com


_____/s/_____
Nathaniel Shoaff (Pro hac vice pending)
Senior Attorney
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org


_____/s/_____
Ann Alexander (Pro hac vice pending)
Senior Attorney
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94101
(415) 875-6190
aalexander@nrdc.org


*Attorneys for Plaintiffs*