THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, NATIONAL PARKS CONSERVATION ASSOCIATION, GRAND CANYON TRUST, WILDEARTH GUARDIANS, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | Case No. 2:19-cv-00256-DBB |
| v. | District Judge David Barlow |
| U.S. BUREAU OF LAND MANAGEMENT, an agency within the U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR, a federal agency; JOSEPH R. BALASH, in his official capacity as Assistant Secretary for Land and Minerals within the Department of the Interior; DAVID BERNHARDT, in his official capacity as Secretary of the Department of the Interior, | |
| Defendants, | |
| and | |
| ALTON COAL DEVELOPMENT LLC, and STATE OF UTAH, | |
| Intervenor-Defendants. | |

Plaintiffs Utah Physicians for a Healthy Environment, Sierra Club, Natural Resources

Defense Council, National Parks Conservation Association, Grand Canyon Trust, and WildEarth

Guardians (Plaintiffs) challenge[1] Defendant U.S. Bureau of Land Management's (BLM) analysis under NEPA of environmental impacts of a proposed coal lease authorizing the expansion of Intervenor Defendant Alton Coal Development (Alton)'s coal mine onto 2,114 acres of federal land and mineral estate.

Having considered the parties' briefing,[2] the administrative record,[3] and relevant law, the court grants in part and denies in part Plaintiffs' requested relief.

## I. STANDARD OF REVIEW

In its review of agency action, the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[4] "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."[5]

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.[6]

---

[1] Complaint for Declaratory and Injunctive Relief (Complaint), ECF No. 2, filed April 16, 2019.

[2] The briefing in this case consisted of the following materials: Plaintiff's Opening Brief, ECF No. 46, filed February 26, 2020; Federal Defendants' Response Brief on the Merits, ECF No. 61, filed April 13, 2020, Alton Coal Development LLC's and State of Utah's Joint Response to Plaintiffs' Opening Brief, ECF No. 62, filed April 13, 2020, and Plaintiffs' Reply Brief, ECF No. 67, filed May 11, 2020.

[3] Notice of Filing of Administrative Record (AR), ECF No. 44, filed December 20, 2020.

[4] 5 U.S.C. § 706(2)(A).

[5] *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation and internal quotation marks omitted).

[6] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (citation and internal quotation marks omitted).

## II. STATUTORY SETTING

Congress enacted the National Environmental Policy Act of 1969 (NEPA) recognizing the "profound impact" of human activity on the natural environment, "particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances."[7] "The centerpiece of environmental regulation in the United States, NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."[8] "NEPA has two aims . . . , it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[9] It is "strictly a procedural statute" and does not require substantive results.[10]

NEPA requires that "[b]efore embarking upon any 'major federal action,' an agency must conduct an environmental assessment (EA) to determine whether the action is likely to 'significantly affect the quality of the human environment.'"[11] Where the proposed action is not likely to significantly affect the environment, the agency may issue a "[f]inding of no significant impact" (FONSI), a document explaining the findings and the reasons why an environmental impact statement (EIS) will not be prepared.[12] By contrast, an EIS is required for all "major

---

[7] 42 U.S.C. § 4331(a).

[8] *Richardson*, 565 F.3d at 703.

[9] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1236–37 (10th Cir. 2011) (citation and internal quotation marks omitted).

[10] *Id.*

[11] *Richardson*, 565 F.3d at 703 (brackets omitted) (quoting 42 U.S.C. § 4332(2)(C)).

[12] 40 C.F.R. § 1508.13.

Federal actions significantly affecting the quality of the human environment."[13] An EIS must "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."[14] "[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."[15]

In reviewing agency action for NEPA compliance, courts look to determine whether agencies have taken a "hard look" at the environmental consequences of their decisions.[16] Ultimately, the "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."[17] "This standard of review is 'very deferential' to the agency's determination, and a presumption of validity attaches to the agency action such that the burden of proof rests with the party challenging it."[18]

### III. FACTUAL BACKGROUND

The focus of this case is the BLM's approval of a lease expansion application by Alton. The application sought to more than double the size of Alton's Coal Hollow Mine in southern

---

[13] 42 U.S.C. § 4332(C).

[14] 40 C.F.R. § 1502.1.

[15] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

[16] *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196; *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340–41 (D.C. Cir. 2002).

[17] *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97–98 (1983).

[18] *Kobach v. United States Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014).

Utah.[19] Alton's operations would expand onto federal land and implicate federal mineral rights.[20] In 2004, Alton filed a Lease by Application seeking to obtain a lease for the Mine expansion.[21] In 2011, BLM published a Draft Environmental Impact Statement (DEIS) concerning the proposed Lease by Application.[22]

During the comment period for the DEIS, BLM received more than 154,000 comments.[23] Many of the comments were critical of the BLM's analysis and urged the BLM to select the "no action" alternative regarding the proposed expansion.[24] Subsequent to this comment period, BLM published a supplemental DEIS (SDEIS) in 2015.[25] BLM received more than 39,000 comments on the SDEIS, including comments from Plaintiffs.[26] Plaintiffs, in their comments, also argued that the analytical information contained in the SDEIS was inadequate.[27]

BLM published its Final Environmental Impact Statement (FEIS) in July 2018.[28] BLM then issued the Record of Decision (ROD) approving the Lease Application for the Mine on August 29, 2018.[29] The ROD incorporated by reference the alternatives and analysis set forth in

---

[19] AR 162245.

[20] *Id.*

[21] AR 159487.

[22] AR162253–54.

[23] AR 162254.

[24] *See* AR 013068–69, 075611–6, 075543–609, and 075763–73.

[25] AR 159487.

[26] AR 162256.

[27] *See* AR 094950–5000.

[28] AR 156641.

[29] AR 162243.

the FEIS.[30] On April 16, 2019, Plaintiffs filed a complaint in this court challenging BLM's approval of the lease sale.[31]

## IV. DISCUSSION

Plaintiffs argue that BLM violated NEPA in three ways. First, BLM quantified the greenhouse gases (GHGs) that would be generated directly and indirectly by the mine expansion, but failed to analyze the impact of that pollution, all while promoting the economic benefits of the mine and refusing to use the Social Cost of Carbon analysis to quantify the costs.[32] Second, BLM failed to analyze the cumulative impacts of all Department of Interior coal mining projects under review, instead limiting its review to climate impact sources in two counties.[33] Finally, BLM failed to properly analyze the impact of mercury emissions despite the information available to it.[34]

### A.  The FEIS' Handling of GHGs, Climate Change, and Socioeconomics Is Deficient.

Plaintiffs argue that BLM violated NEPA by failing to disclose the indirect impact of GHGs.[35] Specifically, Plaintiffs contend that BLM simply performed a "bare arithmetic emissions calculation" and "reduced to dollar amounts a project's purported benefits," but failed "to do the same for the social and economic *costs* associated with GHG emissions."[36]

The FEIS addresses GHG emissions two ways. First, it performs a quantification of the amount of GHGs that will be released from the direct and indirect effects of the proposal and

---

[30] AR 162246.

[31] *See* Complaint.

[32] Plaintiffs' Opening Brief at 9.

[33] *Id*.

[34] *Id*.

[35] Plaintiffs' Opening Brief at 14.

[36] *Id.* at 16.

then contextualizes the emissions globally. The FEIS notes that GHGs will be produced by the combustion of the coal and by the project's vehicles and equipment.[37] It explains that "[t]he $CO_2$ emissions for the Proposed Action or Alternative C would be 58,984 tons (53,510 metric tons)[.]"[38] and notes that "[t]his total includes all on-site emissions, as well as off-site emissions from employee travel, haul truck traffic, cars and light duty trucks, and heavy duty diesel vehicles."[39] As for the selected alternative (Alternative K1), BLM explained that direct emissions "would be equal to or less than those reported for the Proposed Action and Alternative C," i.e., 58,984 tons of $CO_2$ emissions.[40]

As to indirect emissions, the FEIS states that the selected alternative is estimated to produce approximately two million tons of coal. It then uses "EPA's default emission factor of 4,810 pounds per ton of subbituminous coal (EPA 1998b) . . . to approximate annual $CO_2$ emissions from combusting the 2 million tons of coal that would be produced from the tract."[41] BLM ultimately concluded that, "[b]ased on this emission factor, the end user(s) of the coal produced from the tract would emit 4.8 million tons of $CO_2$ per year (4.4 million metric tons)."[42] Based on this information, BLM provided benchmarks against which to compare the mine expansion's anticipated emissions, with BLM explaining that coal from the tract would contribute approximately 0.022% of total worldwide annual production and combustion of the coal would constitute 0.013% of the total $CO_2$ emissions from 2014 global fossil fuel

---

[37] AR 159821.

[38] AR 159821.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id. See also* AR 159820 (discussing indirect impacts of mercury), AR 159916 (Table 4.14.2 addressing indirect GHG emissions from rail transport of mined coal).

combustion.[43] As for national emissions, the FEIS states that "[g]lobally, the United States accounted for approximately 16% of the $CO_2$ added to the atmosphere through the combustion of fossil fuels in 2014," and provided the percentage of national emissions from other sources, including coal mines.[44]

Second, the FEIS qualitatively describes the effects of GHGs on the environment. In the section on climate change, the FEIS states that "GHG emissions, which contribute to climate changes, do not remain localized but become mixed with the general composition of the earth's atmosphere."[45] The FEIS quotes repeatedly from the Intergovernmental Panel on Climate Change (IPCC), stating that "'[w]arming of the climate system is unequivocal,'" that "most of the temperature increases since the middle of the twentieth century '[are] very likely due to the observed increase in anthropogenic [GHG] concentration.'"[46] The FEIS further relies on the IPCC to state that most of the "$CO_2$ [is] coming from the combustion of fossils."[47]

The FEIS then describes the environmental impact of climate change as: "more frequent heat waves, droughts, and fires; rising sea levels and coastal flooding, melting glaciers, ice caps, and polar ice sheets; more severe hurricane activity and increases in frequency and intensity of severe precipitation; spread of infectious diseases to new regions; loss of wildlife habitats; and heart and respiratory ailments."[48] The FEIS describes some of these and others as

---

[43] See AR 159822; see also AR 159821 (discussing that emissions from other sources are included in the global scale emissions and explaining that "33,733 million metric tons of $CO_2$ were added to the atmosphere through the combustion of fossil fuels in 2014").

[44] AR 159603.

[45] AR 160064.

[46] AR 160065.

[47] AR 160066.

[48] Id.

"socioeconomic costs."[49] The FEIS further states that "average surface temperatures in the United States have increased, with the last decade being the warmest in more than a century of direct observations."[50] It further identifies climate change environmental impacts in North America as including "extended periods of high fire risk and large increases in burned areas; increased intensity, duration, and frequency of heat waves; decreased snowpack, increased winter and early spring flooding potentials, and reduced summer stream flows in the western mountains; and increased stress on biological communities and habitat in the coastal areas."[51] Finally, the FEIS observes that "Emissions of GHGs resulting from both the production and combustion of the tract coal would increase the atmosphere's concentration of GHGs, and in combination with past and future emissions from all other sources, they would contribute incrementally to the global warming that produces the adverse effects of climate change described previously."[52]

Between the FEIS' quantification of the GHGs that will be emitted and its qualitative discussion of the effects of GHGs, it is clear that Plaintiffs' claim that BLM only performed a "bare arithmetic emissions calculation" of GHGs is not correct.[53] BLM applied a "proxy methodology:" it calculated direct and downstream greenhouse gas emissions from the proposed action and then analyzed them within the context of national and global projections.[54] As noted previously, BLM also qualitatively discussed the environmental impacts of GHGs.

---

[49] *Id*.

[50] *Id*.

[51] *Id*.

[52] *Id*.

[53] Plaintiffs' Opening Brief at 16.

[54] *See* AR 159821–22.

However, Plaintiffs are correct that BLM quantified the project's socioeconomic benefits, but did not quantify the costs of GHG emissions."[55] In the socioeconomics section, the FEIS forecasts the number of jobs that will be created, the income from those jobs, the economic contribution from Utah-produced coal, federal royalties, tax revenue, and downstream economic benefits.[56] The same section discusses possible declines in some housing values, limited effects on recreation, increases in traffic and noise, night sky impacts, decreases in air quality, the prospects of blasting damage, the possibility of underground coal fires, and environmental justice issues.[57] But nowhere are the economic costs of GHGs quantified. Plaintiffs contend that since the economic benefits were quantified, BLM should have used the Social Cost of Carbon ("SCC") to forecast the economic costs, which Plaintiffs contend would have shown economic damages between "$24.6 million to as much as $7 billion annually."[58]

For its part, BLM argues that it is not required to perform a cost-benefit analysis and that it did not perform one.[59] It contends that some effects are more easily assessed and understood quantitatively, while others are better described qualitatively.[60] BLM further asserts that NEPA simply does not require it to monetize all of a proposal's effects.[61] BLM also argues that is not required to use the SCC, and that it adequately explained its reasons for not using it.[62]

---

[55] Plaintiffs' Opening Brief at 16.

[56] AR 159876–159882.

[57] AR 159882–159890.

[58] Plaintiffs' Opening Brief at 20. Plaintiffs also argue that 40 C.F.R. § 1502.22(b)(4) requires use of the SCC in the FEIS because it is "generally accepted in the scientific community." *Id.* at 24-25. Plaintiffs do not develop their argument and provide no caselaw, persuasive or otherwise, that has read that regulation to require use of the SCC.

[59] Federal Defendants' Response at 9–10. Plaintiffs agree that a cost-benefit analysis is not required and was not performed. Plaintiff's Opening Brief at 26.

[60] Federal Defendants' Response at 10.

[61] *Id.*

[62] *Id.* at 8–9.

Plaintiffs rely on three district court cases in support of using the SCC to monetize GHG emissions. In the first of these, defendants argued "[s]tandardized protocols designed to measure factors that may contribute to climate change, and to quantify climatic impacts, are presently unavailable. . . ."[63] The court rejected this claim, noting that defendants in fact used the SCC in its Draft Environmental Impact Statement ("DEIS"), but then removed it in the FEIS.[64] The court noted that the "agencies, of course, may have been able to offer non-arbitrary reasons why the protocol should not have been included in the FEIS. They did not." As a result, the court found that the FEIS violated NEPA. Here, BLM did not include the SCC in its DEIS, only later to exclude it. It also explained why it decided not to use the SCC.[65]

In another case, the court accepted plaintiffs' argument that it was arbitrary and capricious to quantify economic benefits without also quantifying the costs imposed by GHGs.[66] However, the court there found that the defendants had concluded "not that the specific effects of greenhouse emissions from the expansion would be too uncertain to predict, but that there would in fact be *no* effects from those emissions, because other coal would be burned in its stead."[67] Here, the FEIS makes no such claim, instead calculating the direct and indirect GHGs that will result from the proposal.[68] Later, in a follow up case involving the same project, the court

---

[63] *High Country Conservation Advocs. v. United States Forest Serv.*, 52 F. Supp. 3d 1174, 1190 (D. Colo. 2014).

[64] *Id.* at 1191.

[65] *Id.* at 1191–92.

[66] *Montana Env't Info. Ctr. v. U.S. Off. of Surface Mining*, 274 F. Supp. 3d 1074, 1098 (D. Mont. 2017), amended in part, adhered to in part sub nom. *Montana Env't Info. Ctr. v. United States Off. of Surface Mining*, 2017 WL 5047901 (D. Mont. Nov. 3, 2017).

[67] *Id.* at 1098.

[68] AR 159821–22.

accepted the decision not to use the SCC because the agency had found it to be "too uncertain and indeterminate to be useful to the analysis."[69]

The final case cited by Plaintiffs found that because the agency "quantified the benefits of the proposed action, it must also quantify the associated costs or offer non-arbitrary reasons for its decisions not to."[70] The court then examined the agency's reasons for not using the SCC and found them arbitrary. Here, BLM explained its concerns with the SCC, including fundamental technical issues, significant variations in results, as well as concerns that including it would be unbalanced and potentially inaccurate.[71] Decisions that implicate an agency's technical or scientific expertise are entitled to "especially strong" deference.[72] Whether to use a particular tool or methodology, like the SCC, is a decision that implicates agency expertise.[73] The court does not find that BLM violated NEPA by not using the SCC to calculate costs from the project's GHGs.[74]

However, the FEIS' treatment of GHGs and their costs is still problematic. The "Greenhouse Gases" subsection calculates the volume of projected GHGs from the proposal and contextualizes it in terms of total global emissions, but it says nothing about the environmental effects and socioeconomic costs of GHGs.[75] The "Climate Change" subsection, which appears

---

[69] *Montana v. Bernhardt*, 443 F. Supp. 3d 1185, 1196 (D. Mont. 2020).

[70] *WildEarth Guardians v. Zinke*, 2019 WL 2404860, at *11 (D. Mont. Feb. 11, 2019), report and recommendation adopted sub nom. *WildEarth Guardians v. Bernhardt*, 2021 WL 363955 (D. Mont. Feb. 3, 2021).

[71] AR 160371–37.

[72] *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

[73] See *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006)

[74] See *EarthReports, Inc. v. Fed. Energy Regulatory Comm'n*, 828 F.3d 949, 956 (D.C. Cir. 2016); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 78–79 (D.D.C. 2019); *Wilderness Workshop v. Bureau of Land Mgmt.*, 342 F. Supp. 3d 1145, 1159–60 (D. Colo. 2018); *W. Org. of Res. Councils v. Bureau of Land Mgmt.*, CV 16-21-GF-BMM, 2018 WL 1475470, at *14 (D. Mont. Mar. 26, 2018).

[75] AR 159821–22.

nearly 250 pages after the "Greenhouse Gases" subsection, qualitatively discusses the effects of GHGs on the climate generally, but does not include or even reference the quantities of GHGs the project will generate.[76] Finally, the "Socioeconomics" section, which contains the income, taxes, royalties, and related economic data to which Plaintiffs refer, says nothing about the socioeconomic costs of GHGs—qualitatively or otherwise—even though the "Greenhouse Gases" subsection, which appears 200 pages later, acknowledges that the "socioeconomic costs" and "socioeconomic impacts" from climate change are many.[77] These three sections, which should be working together to paint a clear picture for decisionmakers and the public[78] of the impacts of the GHGs that will result from the project, instead end up being ships passing in the night.

This is not mere flyspecking. NEPA has two aims: "it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[79] It is one thing for BLM to find that, as a matter of agency expertise, it should not use a particular tool to monetize the impacts from GHGs and climate change. But it is unacceptable for the information and analysis that is included on the topic to be spread out and disjointed in such a way that the public is unlikely to find the related pieces and put them together or to have confidence that the agency considered the interrelated qualitative and quantitative information as a whole. It is in the analysis of the GHGs from the proposed action with the climate change effects that the agency shows that it has taken a hard

---

[76] AR 160065–67.

[77] AR 159875–159901.

[78] *See Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1178.

[79] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1236–37 (10th Cir. 2011) (citation and internal quotation marks omitted).

look at the indirect effects of the project. This is particularly true on this record, where there are multiple pages laying out the significant economic benefits in the "Socioeconomics" subsection, but no discussion there at all about the socioeconomic costs from GHGs and climate change. The socioeconomics section may not lay out the economic benefits from the proposal without analyzing the socioeconomic costs of GHGs *together with* climate change.

The agency is owed some deference on the tools it uses. And the court will not adopt a categorical test that if economic benefits are quantified then economic costs always must be too, because, among other things, some costs may not accurately be reduced to numbers. However, agencies must present their relevant quantitative and qualitative information and analyses in a way that the court and the public can be confident that the agency has taken the requisite "hard look."

### B.  BLM Failed to Take a Sufficiently Hard Look at the Cumulative Impact of GHG Emissions.

Plaintiffs also challenge the BLM's analysis of the cumulative impact of the GHG emissions from the expanded Alton Mine.[80] Plaintiffs fault BLM for failing to analyze the cumulative impacts of all Department of Interior coal mining projects under review and limiting its review to climate impact sources in two counties.[81] Plaintiffs contend that the size of the Cumulative Impacts Assessment AREA (CIAA) was too limited and that the proposed action's "downstream GHG emissions should have been considered together with other contemporaneous

---

[80] Plaintiffs' Opening Brief at 28–32.

[81] *Id*.

federal coal mine approvals."[82] Plaintiffs urge the court to follow two recent district court decisions imposing this requirement.[83]

For its part, BLM notes that the cases Plaintiffs cite are non-binding. BLM argues that the needed impacts analysis and information are present and contends that 40 C.F.R. § 1508.7 and 40 C.F.R. § 1508.25 indicate no such "all federal" or "all DOI or BLM" mine approvals approach is required or permitted.[84]

The applicable regulation defines cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."[85] The plain language of the regulation does not permit the agency to limit its analysis to federal sources. But the question is not whether the considered actions involve the federal government generally or the Department of Interior or BLM specifically, but rather whether all "the past, present, and reasonably foreseeable future actions" are sufficiently addressed.

Reviewing the sufficiency of a cumulative-impacts analysis, the court "must examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making."[86] "A meaningful cumulative impact analysis" must address:

---

[82] Plaintiffs' Opening Brief at 30.

[83] *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 77 (D.D.C. 2019); *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018), *order amended and supplemented*, 369 F. Supp. 3d 1045 (D. Mont. 2018), *and appeal dismissed and remanded sub nom. Indigenous Envtl. Network v. U.S. Dep't of State*, No. 18-36068, 2019 WL 2542756 (9th Cir. June 6, 2019).

[84] Federal Defendants' Response at 14–18.

[85] 40 C.F.R. § 1508.7.

[86] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1251–52 (10th Cir. 2011) (citation and internal quotation marks omitted).

> (1) the area in which the effects of the proposed project will be felt; (2) the
> impacts that are expected in that area from the proposed project; (3) other
> actions—past, present, and proposed, and reasonably foreseeable—that have had
> or are expected to have impacts in the same area; (4) the impacts or expected
> impacts from these other actions; and (5) the overall impact that can be expected
> if the individual impacts are allowed to accumulate.[87]

Here, the cumulative impacts section in the FEIS accomplishes much of this, but still falls short. The FEIS takes two different approaches in its cumulative impacts section: one that applies to GHGs and one that applies to all other impacts. First, the FEIS discusses GHGs and climate change generally. As noted earlier, this includes statements that "GHG emissions, which contribute to climate changes, do not remain localized but become mixed with the general composition of the earth's atmosphere."[88] The FEIS notes that most of the "$CO_2$ [is] coming from the combustion of fossils."[89] The FEIS lists numerous global environmental impacts[90] and national impacts as well.[91] The FEIS then states that regionally "natural variability in climate parameters . . . .makes it difficult to attribute particular environmental impacts to climate change."[92] But the cumulative impacts section provides no data or substantive discussion about GHGs from other present "and reasonably foreseeable future actions." And while GHG data from the Alton mine project is calculated elsewhere,[93] it is never discussed or even referenced in the cumulative impacts analysis.[94]

---

[87] *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (quoting *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006)).

[88] AR 160064.

[89] AR 160066.

[90] *Id*.

[91] *Id*.

[92] *Id.*

[93] AR 159822–23.

[94] AR 160064–67.

Second, the cumulative impacts section also defines a CIAA for purposes of discussing cumulative impacts. The FEIS defines the CIAA as "the BLM-KFO, approximately 2.85 million acres of lands in Kane and Garfield counties, and the reasonably foreseeable coal haul transportation route (Map 4.6)."[95] The FEIS explains that the CIAA is a reasonable area of analysis because "there is a reasonable degree of data available" for it, it is large enough to take into account certain far-reaching impacts, and "it is small enough that analyses do not become unreasonably cumbersome to complete with an acceptable degree of accuracy and precision."[96] The FEIS then inventories reasonably foreseeable actions and developments in the CIAA for the next twenty years; identifies likely coal, oil, and gas development in the CIAA; and discusses cumulative impacts involving sound, views, pollution, cultural resources, fire management, land use, livestock, paleontology, recreation, vegetation, water resources, and wildlife.[97] While present and "reasonably foreseeable future" fossil fuel developments in the CIAA are identified, no quantitative or qualitive discussion is provided for the CIAA regarding GHG emissions, though data regarding other emissions are provided.[98]

In short, while the cumulative impacts section accomplished much of its NEPA-required mandate, on GHGs it failed to meaningfully describe and discuss relevant information regarding other present and reasonably foreseeable future GHG sources. While NEPA "does not require the impossible,"[99] the cumulative impacts analysis here failed to substantively account for and

---

[95] AR 160050.

[96] *Id.*

[97] AR 160051–160064; AR 160067–160078.

[98] *E.g.,* AR160060–61.

[99] *WildEarth Guardians* 368 F. Supp. 3d 41 at 77.

analyze the present and reasonably foreseeable future sources of GHGs.[100] However, the court declines Plaintiffs' invitation to impose a requirement that *all* federal or Department of Interior mining approvals must be included. The decision implicates agency expertise, which is due some deference.[101] Nevertheless, the deficiencies identified above must be corrected.

### C.  BLM Took a Sufficiently Hard Look at Mercury Emissions.

Plaintiffs also argue that BLM failed to adequately analyze the emissions of mercury from coal combustion.[102] Plaintiffs contend that "other federal agencies have analyzed the impacts of mercury deposition on fish" and argue that the Colorado pikeminnow is particularly vulnerable, but that the FEIS does not identify or discuss this information, despite the likelihood that mercury from coal burning at Intermountain Power Plant (IPP) will affect those fish.[103]

The FEIS notes that the Alton Mine currently provides IPP coal and notes it "could continue to supply no more than 6%-19% of the coal combusted at the plant annually until 2025" (after that date, the power project facility will convert to burning gas).[104] The FEIS further notes: "[i]n actuality, the coal mined from the tract would likely be shipped to a variety of end users, and the various control technologies that may or may not be used by operators of facilities that ultimately burn the coal would cause emission rates to vary."[105]

---

[100] BLM's argument about the meaning of 40 C.F.R. § 1508.25, which defines the scope of an EIS, has no effect on this conclusion. The question before the court is not whether there are connected or similar actions that require full discussion in the same EIS, but rather whether present and reasonably foreseeable future actions involving emission of GHGs have been considered in the cumulative impacts assessment.

[101] *See Kleppe v. Sierra Club*, 427 U.S. 390, 413–414 (1976).

[102] Plaintiff's Opening Brief at 32.

[103] *Id.* at 34.

[104] AR 159796, 159820.

[105] AR 159796.

Regarding mercury, the FEIS states that "coal-fired power plants contribute to mercury deposition in the land, water and atmosphere" and that mercury "accumulates in the food chain and can be toxic to fish, wildlife, and humans."[106] The FEIS calculates that 166 pounds of mercury would be released by the burning of the coal in the proposed action.[107] Finally, the FEIS finds that the "IPP cannot combust a coal tonnage that would result in an exceedance of the mercury emissions limit in its Title V Operating Permit."[108] In response to comments requesting analysis of mercury deposition on specific fish species, the FEIS also states:

> These fish species and their habitats do not occur where the Alton tract and the reasonably foreseeable coal haul transportation route would exist. It is not known with any certainty where the coal mined from the tract would be shipped and combusted. Because a specific location for the combustion of the coal is not reasonably foreseeable, deposition impacts to the fish mentioned by the commenter cannot be analyzed in the FEIS.[109]

Plaintiffs assert that this is insufficient, arguing that BLM should have used earlier studies by other agencies that the conservation groups identified as a "roadmap" for its own analysis.[110] For example, Plaintiffs identify an extensive Endangered Species Act Biological Opinion the U.S. Fish and Wildlife Service prepared in 2015 for a different power plant and mine.[111] Plaintiffs do not identify any caselaw suggesting that this level of detail is required by NEPA, nor do Plaintiffs' statements that the fish they identify are "in proximity to" or "near" IPP sufficient to support a NEPA violation. But Plaintiffs also cite to decisions by two other federal courts which considered the issue of mercury emissions.

---

[106] AR 159820.

[107] *Id.*

[108] *Id.*

[109] AR 160374.

[110] Plaintiffs' Opening Brief at 39.

[111] AR 96405-605.

However, these non-binding cases are distinguishable. In one case, the Office of Surface Mining (OSM) did not even prepare an EIS and unsuccessfully argued that the project in question would not have altered the environmental status quo.[112] The court also found it significant that the mine and the power plant in question were "unusually interconnected," that the power plant was "'designed and constructed specifically to burn coal from the [] mine,'" that "all of the coal" would be combusted at the power plant, and that "there is no uncertainty as to the location, the method, or the timing of this combustion."[113] By contrast, here BLM did not treat the mercury emissions as insignificant or accounted for by the status quo. Also, the mine supplies only a fraction of the coal used by the IPP and is not required to supply all its coal to the plant; there is some uncertainty to "the location, the method, and the timing of this combustion." Even Plaintiffs acknowledge that the BLM went further than OSM did because it—as part of the recognition that burning Alton-mined coal would impact the environment—quantified mercury emissions.[114]

In the other case cited by Plaintiffs, the court faulted the OSM for not discussing local effects of coal emissions and failing to explain why a local effects analysis is not feasible.[115] The opinion references many pollutants and lists mercury as one of them, but does not discuss mercury in any detail.[116]

---

[112] *Diné Citizens Against Ruining Our Environment v. United States Office. of Surface Mining Reclamation & Enforcement*, 82 F. Supp. 3d 1201, 1214–15 (D. Colo. 2015), *order vacated in part, appeal dismissed in part sub nom. Dine Citzens Against Ruining our Env't v. U.S. Off. of Surface Mining Reclamation & Enf't*, 643 F. App'x 799 (10th Cir. 2016).

[113] *Id*. at 1213.

[114] Plaintiffs' Opening Brief at 39.

[115] 2021 WL 363955, *7 (D. Mont. Feb. 3, 2021).

[116] *Id*.

Here, BLM acknowledged that coal mined at the Alton facility and then combusted at IPP or elsewhere would emit mercury; calculated the approximate amount of mercury emissions; stated that mercury can be toxic to fish, wildlife, and humans; and explained why a more detailed IPP-centered mercury analysis was not performed.[117] As the BLM correctly notes, the cases that Plaintiffs cite do not stand for the proposition that NEPA requires the sort of analysis that Plaintiffs propose here.[118] Indeed, federal regulations set forth that Environmental Impact Statements are to be "analytic rather than encyclopedic."[119] While BLM's treatment of mercury could have been more extensive, the court's role is not to substitute its own judgment for the agency's,[120] but instead to decide whether the agency violated NEPA's "hard look" requirement. Based on the authority presented and the record, it did not.

## V. REMEDY

If an agency's action is arbitrary and capricious, the APA requires a court to hold it unlawful and set it aside.[121] In practice, this means the court could (1) remand to BLM with (or without) instructions to take additional actions or steps, or (2) vacate the leases and remand for further study.[122] The Tenth Circuit has observed, "Vacatur of agency action is a common, and

---

[117] *Id.*

[118] Federal Defendants' Reply at 23.

[119] 40 C.F.R. § 1502.2 (a)

[120] *See Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1164 (10th Cir. 2002), *as modified on reh'g,* 319 F.3d 1207 (10th Cir. 2003).

[121] 5 U.S.C. § 706(2)(A). The Tenth Circuit has explained:

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017).

[122] *See WildEarth Guardians*, 870 F.3d at 1239.

often appropriate form of injunctive relief granted by district courts."[123] This equitable authority, of course, requires some consideration of the best means to correct the errant agency decision.[124]

Here, because BLM failed to take a sufficiently "hard look" at the indirect effects and cumulative impacts of GHGs, the court remands the EIS to BLM for revision. The court declines Plaintiffs' request for an order vacating the Alton Lease approval FEIS and ROD. The record does not suggest that BLM will fail to "substantiate its decision on remand."[125] And, given that an order of vacatur would disrupt the activities that have commenced since the lease approval, the court determines that vacatur would "lead to impermissibly disruptive consequences in the interim."[126]

## VI. ORDER

For the reasons stated in this Memorandum Decision and Order, this matter is REMANDED to BLM for further administrative proceedings consistent with this opinion.

Signed March 24, 2021.

BY THE COURT

David Barlow
United States District Judge

---

[123] *Id.*

[124] *Id.* at 1240. It is inaccurate to suggest as Respondents do, however, that this form of "injunction" should be analyzed under Rule 65 elements. For example, they argue that Petitioners have not made a "'clear showing' of irreparable harm" absent an injunction. ECF No. 54 at 29. There is no request for preliminary injunction before the court and the well-known Rule 65 analysis does not apply.

[125] *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) (citing Williston Basin Interstate Pipeline Co. v. FERC, 519 F.3d 497, 504 (D.C. Cir. 2008). *See also WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (determining that remand rather than vacatur of oil and gas leases was appropriate because, among other things, "nothing in the record indicates that on remand the agency will necessarily fail to justify its decisions.").

[126] *Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 97.